**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CAROLYN HALL,

    *Plaintiff,*

    v.

SHEPPARD PRATT
HEALTH SYSTEM, INC.,

    *Defendant*

Civil Action No.
22-cv-3261-ABA

**MEMORANDUM OPINION**

Sheppard Pratt Health System, Inc. ("Sheppard Pratt") is a private, non-profit health organization that provides a range of behavioral health services to children, adolescents, and adults. One component of Sheppard Pratt is its Center for Eating Disorders (the "Center for Eating Disorders" or the "Center"), a specialized facility that treats anorexia nervosa, bulimia nervosa, binge eating, and other feeding and eating disorders. The Center includes a 24-bed inpatient unit and, given the nature of severe eating disorders, "treats far more medically fragile individuals . . . than any other unit" at Sheppard Pratt. ECF No. 32-2 ¶ 30.

Plaintiff Carolyn Hall worked as a patient intake coordinator at the Center. In the fall of 2021, when COVID-19 levels were rising and vaccination was becoming more readily available, Sheppard Pratt decided to make COVID vaccination mandatory for its employees. Ms. Hall requested an exemption from the vaccine mandate, on religious grounds. Sheppard Pratt denied the request, concluding that, unless vaccinated for COVID, Ms. Hall's intensive, in-person interaction with the hospital staff and medically vulnerable patients at the Center would constitute an undue hardship on the Center's patients and employees, and the health system overall. Ms. Hall then sued Sheppard Pratt, alleging unlawful religious discrimination under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Sheppard Pratt has moved for summary judgment. *See* ECF No. 32; *see also* ECF No. 32-1 ("Def.'s Mem."). The issues are fully briefed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, the undisputed evidence establishes that accommodating Ms. Hall's vaccine exemption request would have presented an undue hardship. Accordingly, Sheppard Pratt is entitled to summary judgment.

## BACKGROUND[1]

Ms. Hall began working at Sheppard Pratt in May 2007. ECF No. 32-4 at 69:21-70:3. About three years later, she became an Admissions Nurse at the Center for Eating Disorders, *id.* at 66:9-18, a destination for a particularly vulnerable population of patients. ECF No. 32-2 ¶ 11, 47; ECF No. 32-4 at 95:10-19. Patients often come to the Center after multiple failed treatments for eating disorders elsewhere. ECF No. 32-2 ¶ 47. Many of the Center's patients have severe co-occurring medical conditions, and/or other behavioral health conditions, alongside their eating disorders. ECF No. 32-4 at 71:3-4; ECF No. 32-2 ¶ 45. Co-occurring medical conditions can range from electrolyte imbalances to arrhythmia (abnormal heart rhythm) to organ inflammation. ECF No. 32-2 ¶¶ 32, 35, 43. Some patients arrive by ambulance for admittance, too weak to even walk. ECF No. 32-4 at 75:7-11, 80:8-21.

In 2020, Ms. Hall was promoted to Admissions Coordinator. *Id.* at 95:10-19. This role required face-to-face interactions with hospital staff and patients; she was primarily responsible for guiding new patients and their families through the Center's intake procedures. ECF No. 32-4

---

[1] Because Sheppard Pratt has moved for summary judgment, the Court must view the evidence in the light most favorable to Ms. Hall, as the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 656-67 (2014), and draw all reasonable inferences in her favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The facts are set forth with this standard in mind.

at 76:5-77:8, 79:1-8, 80:19-21, 89:18-90:3, 91:1-9; ECF No. 37-1 ¶ 21. The process generally

lasted at least ten minutes, concluding with an introduction to the treating nurse. ECF No. 32-6 at

12:9-12; ECF No. 37-1 ¶ 22. Ms. Hall worked weekdays from 8:00 a.m. to 2:30 p.m. and shared

a small office with another employee. ECF No. 32-4 at 77:14-78:16.

Between September 2020 and November 2021, Sheppard Pratt's main hospital recorded

twenty-two COVID-19 outbreaks. ECF No. 32-2 ¶ 20. These outbreaks, which lasted between

ten and thirty-eight days, taxed facility programming, staffing, and resources; each occurrence

forced Sheppard Pratt to isolate patients and alter their treatment plans, enlist temporary staffing,

and make unbudgeted equipment purchases (*e.g.*, face shields, goggles, gloves, isolation gowns,

and N95 masks). *Id.* ¶ 20-25, 27, 54-56.

In August 2021, Sheppard Pratt announced that, in compliance with recently promulgated

state and federal guidance (described below), it would be instituting a mandatory COVID-19

vaccination policy for all its staff. *Id.* ¶ 74; ECF No. 32-4 at 109:15-22, 111:20-112:1. This

decision was based on the severe impact of COVID-19, and Sheppard Pratt's obligation to

protect patients. ECF No. 32-2 ¶ 75, ECF No. 32-2 at 26. The letter from Sheppard Pratt's

President and CEO, along with its Vice President of Human Resources, Karen Robertson-Keck,

read in part as follows:

> COVID-19 cases and hospitalizations continue to increase across
> the country, and the last few weeks have seen the highest average
> since February. Currently, 50% of our nation has been vaccinated
> against COVID-19, and here in Maryland, nearly 80% of adults 18+
> have received at least one vaccination. Most people who are
> hospitalized today from COVID-19—or tragically, dying from
> [COVID-19]—are those who remain unvaccinated. There is still a
> lot of work to be done in order to slow the spread and stop
> community transmission.
>
> As we take care of some of the most vulnerable in our state—across
> our hospitals, schools, and community locations—your health and

> well-being as well as those we serve, remain our priority. We are integral to the COVID-19 response, and we need to ensure we can continue providing the critical programs and services our community needs.
>
> Earlier this week, Governor Hogan shared his latest COVID-19 order that mandated vaccination for all employees across a number of state entities and all hospitals, congregate settings, and nursing homes. Employees must show proof of vaccination, with at least their first shot, by September 1. A number of county school systems have also mandated vaccinations for their employees.
>
> Following this order, we are requiring all employees regardless of location, and including remote workers, to have their first vaccine by September 1.

ECF No. 32-2 at 23. The health system reiterated, however, that it would consider any "[r]equests for bona fide medical or religious exemptions." *Id.* Employees who believed themselves eligible for religious or medical exemption from the policy were invited to submit their requests for exemption. *Id*. at 23, 28-29; ECF No. 32-2 ¶ 73.

Sheppard Pratt received "about 100" requests for exemption on medical grounds, and over 200 requests for exemption on religious grounds. ECF No. 32-3, 26:4-11. Ms. Hall's application was among the latter. ECF No. 32-7. She submitted her request, which included a letter from her pastor, *id.* at 7, within days of the new policy announcement. ECF No. 32-4, 120:12-14, 126:21-127:9. She stated the following as the basis for her request, on August 30, 2021:

> My belief is that my body is a sacred temple belonging to my Creator, God. I bear responsibility to refrain from potential harm such as the COVID vaccine. Additionally, God alone is the giver + taker of life. I object to the use of fetal cells for any reason including the research of COVID 19 [sic] vaccines.

ECF No. 32-7 at 6.

Sheppard Pratt released its formal vaccination policy in November 2021. ECF No. 32-2 at 26-30 ("Mandatory Flu Vaccination & COVID-19 Policy for Inpatient Hospitals, PA, and RTCs," Nov. 8, 2021). That policy provided, among other things, as follows:

> In recognition of the essential and critical nature of Sheppard Pratt's work, we must hold ourselves to the highest standards of preventive health measures. As such, Sheppard Pratt has a responsibility to promote employee safety and prevent the spread of infectious diseases, including COVID-19. Meeting all aspects of this policy is a condition of working at our facility as an employee, volunteer, or contractor (all of whom will be referred to collectively in this policy as "staff").
>
> Requirements of Vaccination
>
> In order to conform with applicable federal and state requirements, including the Maryland Secretary of Health's Amended Directive and Order Regarding Vaccination Matters dated August 18, 2021, recommendations from the Centers for Disease Control and Prevention [("CDC")], and to help staff and the community from transmission of COVID-19, all staff are required to show proof of first dose or single dose of COVID-19 vaccination by September 1, 2021. All staff are required to complete the full shot regimen, including any booster shot, as clinically indicated in order to satisfy this requirement.
>
> . . . .
>
> Noncompliant staff will be met with individually and will exit employment. Should the individual become compliant by either being vaccinated or by obtaining an approved medical or religious exemption before the last day of work, employment will continue.

*Id.* at 28-29.

All exemption requests were reviewed on a case-by-case basis; Sheppard Pratt expressly retained the authority to "determine that the risk posed by an unvaccinated staff member cannot be mitigated and/or constitutes an 'undue hardship' under state and federal law." ECF No. 32-3 at 28:3-5. Ms. Robertson-Keck, the vice president for HR, met with every employee who asked for an exemption. *Id.* at 19:14-20:1, 23:10-15; ECF No. 32-5 ¶ 9. Requests asserting medical reasons

5

for exemption were sent to a third-party, a physician, who reviewed the applications and gave recommendations to Sheppard Pratt pursuant to CDC guidance. ECF No. 32-3 at 20:6-21:6; ECF No. 32-5 ¶ 14.

According to Ms. Robertson-Keck, Sheppard Pratt developed its vaccination policy after researching several sources. ECF No. 32-5 ¶¶ 10-12. To confirm the extent of its obligations for religious accommodations, Sheppard Pratt relied on two EEOC pronouncements for the proposition that an undue hardship constitutes anything that presents "more than a de minimis cost." *Id.* ¶ 13 (citing EEOC's Technical Assistance website, *What you Should Know About Covid-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, Section K.12); *Id.* ¶¶ 8, 11, 12 (citing EEOC regulation entitled *Guidelines on Discrimination Because of Religion*, and specifically 29 C.F.R. § 1605.2(e)(1)). Sheppard Pratt asserts that it evaluated requests for accommodation, including Ms. Hall's, against the backdrop of those legal standards and EEOC guidance. *Id.* ¶ 10.

Identifying the scope and requirements of Ms. Hall's job was the first step Sheppard Pratt took to evaluate her eligibility for exemption. ECF No. 32-3 at 22:17-23:9, 27:5-17. Ms. Robertson-Keck met with the supervisor of every employee who sought an accommodation to verify that the employee's core duties required in-person contact, and if so, to identify ways "that the job could be redesigned" such that Sheppard Pratt could accommodate the employee. *Id.* at 27:14-17. A conversation with Ms. Hall's manager revealed that the essential functions of the Admissions Coordinator position could not be performed without substantial and intensive in-person contact, and the job could not be redesigned to avoid such in-person contact. *Id.* at 43:13-46:17; ECF No. 32-4 at 165:19-166:1; ECF No. 32-6 at 23:12-19.

Sheppard Pratt leadership next met with Ms. Hall in October 2021, to confirm her refusal to become vaccinated, and explore her interest in virtual roles within the Sheppard Pratt health system (*i.e.*, those that could be performed remotely) that matched her skillset. ECF No. 32-3 at 24:7-21; ECF No. 32-4 at 146:17-147:8. Sheppard Pratt offered such transfers to exemption-seeking employees whose essential functions, like Ms. Hall's, required in-person contact and could not be modified. ECF No. 32-3 at 24:7-21. Employees who were amenable to positions that did not involve in-person contact would be reassigned, and their requests for accommodation would be granted. *Id.* In the meeting, Sheppard Pratt told Ms. Hall that it did not question the sincerity of her religious beliefs. *Id.* at 49:8-13; ECF No. 32-4 at 206:1-3. But Sheppard Pratt had serious concerns about the safety risk posed by an unvaccinated employee having direct, extended, close-quarters contact with medically compromised eating disorder patients. ECF No. 32-3 at 44:8-45:2, 59:17-60:4; ECF No. 32-4 at 150:3-7, 206:1-3, 211:4-7.

Sheppard Pratt made that determination for a number of evidence-based reasons, including that, compared to healthy individuals, patients at the Center were at a much higher risk of contracting COVID-19, and their recoveries from infection were typically longer and more severe. ECF No. 32-2 ¶¶ 41-44. The COVID-19 mortality rate was also comparatively higher for patients with mental health disorders, including eating disorders, than the general population. *Id.* ¶¶ 45, 46. The co-occurring medical issues common to many patients exacerbated both the risk of infection and the likelihood of grave symptoms, including death. *Id.* ¶¶ 43-46. The COVID-19 pandemic also "fueled an increase in cases of eating disorders," and also made treatments for eating disorders less effective, more complex, and more expensive. *Id.* ¶¶ 52-54. Each COVID-19 outbreak at Sheppard Pratt compounded the challenges from the instance before, diminishing

the quality of care for existing patients, and limiting (sometimes, altogether eliminating) the ability to admit new patients. *Id.* ¶¶ 24, 25, 27, 54, 55, 56.

Sheppard Pratt also was concerned that accommodating Ms. Hall or other similarly situated employees would diminish its ability to protect the safety of its other employees, and undermine its commitment to prevent the spread of infectious diseases to the public at large. ECF No. 32-2 ¶ 75; ECF No. 32-2 at 23, 28. The treatment programs at the Center involved ongoing close contact between patients and staff. ECF No. 32-2 ¶¶ 48, 49. Group programming was a critical element of treatment for eating disorder patients. *Id.* ¶ 49. Many of the Center's patients also required constant vital checks, and supervised eating and restroom use. *Id.* ¶¶ 49-51.

The effect of the COVID-19 pandemic on the community at large was concerning as well. When Sheppard Pratt announced its vaccination policy in August 2021, over 10,000 people in Maryland alone had died of COVID-19. *Id.* ¶ 81. Reports about Delta, a new and highly contagious variant of the disease, were intensifying. *Id*. ¶ 76. The number of new cases in the state had more than doubled each month for three consecutive months, and COVID-19-related hospital admissions that month were the highest they had been since May 2021. *Id.* ¶¶ 78, 79.

Ms. Hall shared her uneasiness about the vaccine and maintained her opposition to becoming vaccinated. ECF No. 32-4 at 147:11-14. She proposed masking and weekly testing as alternatives to vaccination. *Id.* at 147:15-17, 161:21-162:7. But Sheppard Pratt concluded that such precautions would not be sufficient to mitigate the corresponding risks, given the available scientific evidence, the heightened vulnerability of the Center's patients, and the substantial costs that resulted when outbreaks happened. ECF No. 32-2 ¶¶ 66-70. All employees were required to wear masks under the policy, and Sheppard Pratt concluded that it did not have the resources to implement weekly testing. *Id*. ¶ 64, 70. Sheppard Pratt was also concerned about the reliability

and effectiveness of weekly testing. *Id*. ¶¶ 67-69. The tests sometimes produced false negatives. *Id*. ¶ 67. Testing only once a week also meant Ms. Hall could expose others to infection if she became infected between tests, or tested negative before the virus was detectable. *Id*. ¶¶ 68, 69. Further, the available medical data suggested that unvaccinated individuals were up to three times more likely to transmit COVID-19 than those who were vaccinated, and that transmission between unvaccinated persons remained the leading reason for the ongoing spread of the disease. *Id*. ¶¶ 60-63.

Because the Admissions Coordinator core responsibilities could not be modified to avoid being near staff members and high-risk patients, and because Sheppard Pratt determined there were no vaccination alternatives such that Ms. Hall could continue the job without an unacceptable risk to patients and staff, Sheppard Pratt denied Ms. Hall's exemption request. ECF No. 32-3 at 44:8-45:2, 59:17-60:4; ECF No. 32-4 at 150:3-5, 206:1-3, 211:4-7. Sheppard Pratt informed Ms. Hall that, unless she became vaccinated beforehand, her employment as an Admissions Coordinator in the Center would be terminated in November 2021. ECF No. 32-4 at 147:11-21. She was encouraged to apply for other positions at Sheppard Pratt. *Id.* at 148:17-21. But Ms. Hall neither took the vaccine nor applied for any of the positions that were available in other departments. *Id.* at 148:17-149:15; ECF No. 32-3, 59:15-60:4. Sheppard Pratt terminated her employment in November 2021 and informed Ms. Hall that she would be eligible for rehire in the event her vaccination status no longer conflicted with its safety protocols. ECF No. 32-3 at 77:14-79:3; ECF No. 32-4 at 45:7-8, 168:2-18; ECF No. 37-1 ¶ 1; ECF No. 38-1.

## PROCEDURAL HISTORY

Ms. Hall sued Sheppard Pratt for unlawful discrimination. Sheppard Pratt filed a responsive pleading denying the allegations and asserting undue hardship as an affirmative

defense to her claims. *See* ECF No. 9. Notwithstanding those defenses, Ms. Hall filed a motion for judgment on the pleadings. ECF No. 27. Sheppard Pratt filed an amended answer and the instant motion for summary judgment. ECF Nos. 32, 35. An amended memorandum followed a few days later. ECF No. 36. Ms. Hall filed her opposition to the summary judgment motion, ECF No. 37 ("Pl.'s Opp."), and Sheppard Pratt responded. ECF No. 38.

In a March 2024 opinion and order, this Court denied Ms. Hall's motion for judgment on the pleadings. ECF Nos. 39, 40. The parties' undisputed material allegations did not establish liability for discrimination, given Sheppard Pratt's well-pled denials and assertions of undue hardship in its original and amended Answer. *See* ECF No. 39 at 8. The merits of those allegations were left unresolved.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a "claim or defense—or the part of [any] claim or defense"—by showing that "there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence "might affect the outcome of the suit," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry on a motion for summary judgment, in essence, is whether there is a legitimate disagreement over a controlling issue that "may reasonably be resolved in favor of either party." *Id.* at 250.

In determining the propriety of summary judgment, the Court views the evidence in the light most favorable to the nonmoving party (here, Ms. Hall) and draws all reasonable inferences in that party's favor. *Id.* at 255. The moving party (here, Sheppard Pratt) bears the burden of

demonstrating the absence of any genuine dispute of material fact. *Adickes v. S.H Kress & Co*., 398 U.S. 144, 157 (1970). Once this burden is satisfied, the opposing party cannot prevail without identifying specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). Neither "[u]nsupported speculation," *Felty v. Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987), nor evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, will suffice.

## DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of . . . religion." 42 U.S.C. § 2000e–2(a)(1). "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996) (citing *Mann v. Frank*, 7 F.3d 1365, 1368-70 (8th Cir. 1993)). "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.* Although Ms. Hall appears to challenge Sheppard Pratt's COVID-19 vaccination policy principally as it relates to Sheppard Pratt's alleged failure to accommodate her religious beliefs, whether she intended to also pursue a claim for disparate treatment is uncertain. The Court will therefore address the merits of her claims under both theories of discrimination.

**A.      Ms. Hall's Failure-to-Accommodate Claim**

Ms. Hall contends that Sheppard Pratt's decision to deny her vaccination exemption request, and then terminate her employment based on her failure to comply with the vaccination requirement, constituted unlawful religious discrimination. Sheppard Pratt responds it is entitled to summary judgment because (a) it relied in good faith on, and in conformity with, two EEOC pronouncements, and (b) in any event it could not have accommodated Ms. Hall without undue hardship.

11

As noted above, one way an employer engages in unlawful religious discrimination is by refusing to "reasonably accommodate . . . an employee's or prospective employee's religious observance or practice" where granting such accommodation would not create an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Claims alleging discrimination based on an employer's failure to accommodate an employee's religious beliefs are evaluated under a burden-shifting framework. A plaintiff must first make a prima facie showing of discrimination, meaning the plaintiff (1) "has a bona fide religious belief that conflicts with an employment requirement," (2) "informed the employer of this belief," and (3) "was disciplined for failure to comply with the conflicting employment requirement." *EEOC v. Firestone Fibers & Textiles Co*., 515 F.3d 307, 312 (4th Cir. 2008). If a plaintiff makes such a showing, the burden shifts to the employer to show that the employee's request cannot be accommodated without "undue hardship." *Id.* (citing *Chalmers*, 101 F.3d at 1019, and 42 U.S.C. § 2000e(j)).

Title VII does not define "undue hardship." The Supreme Court has recently explained that "undue hardship" means the "burden" of accommodating an employee's request must be "substantial in the overall context of an employer's business," *i.e.*, "would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 468, 470 (2023). The *Groff* Court also explained that that articulation was not a change from prior caselaw, but rather a "clarifi[cation]," *id.* at 473, of *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), which had articulated "undue hardship" as requiring "more than a *de minimis* cost." *Id.* at 84. Here, Sheppard Pratt argues that the undisputed record entitles it to summary judgment under either version of the undue hardship standard. As explained below, the Court agrees. But because part of Sheppard Pratt's argument is that the pre-*Groff* articulation

should control and that Sheppard Pratt was entitled to rely on pre-*Groff* guidance from the

EEOC, the Court starts with a summary of *Hardison* and *Groff*—and thus what constitutes an

undue hardship within the meaning of the statute, 42 U.S.C. § 2000e(j)—and then explains why

the undisputed evidence in the record entitles Sheppard Pratt to summary judgment on undue

hardship grounds.

### 1.      The undue hardship standard

Title VII of the Civil Rights Act of 1964 made it unlawful for covered employers "to fail

or refuse to hire or to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges [of] employment,

because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a)(1) (1964 ed.). "As originally

enacted, Title VII did not spell out what it meant by discrimination 'because of . . . religion.'"

*Groff*, 600 U.S. at 457. The EEOC issued regulations interpreting the standard, "settl[ing] on a

formulation" in 1968 that "obligated employers to 'make reasonable accommodations to the

religious needs of employees' whenever that would not work an 'undue hardship on the conduct

of the employer's business.'" *Id.* (quoting 29 C.F.R. § 1605.1 (1968)). In 1972, Congress

amended Title VII and adopted statutory language "[t]racking the regulatory language." *Id.* at

458. Thus, since 1972, employers have been permitted to avoid liability for religious

discrimination under Title VII where the employer demonstrates that it is "unable to reasonably

accommodate to an employee's or prospective employee's religious observance or practice

without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

In *Hardison*, the Supreme Court addressed a claim that an employer, by requiring the

plaintiff to work on Saturdays, was discriminating against him because one tenet of his religion,

"known as the Worldwide Church of God," commanded that he "refrain[] from performing any

work from sunset on Friday until sunset on Saturday." 432 U.S. at 67. In a detailed analysis, the *Hardison* Court weighed the plaintiff's protected religious interests against the burdens the employer, an airline, and its employees would bear in accommodating his beliefs, and held those burdens imposed sufficient hardship to justify denying the plaintiff's schedule request. *Id.* at 76-83. The *Hardison* Court articulated its conclusion this way: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." *Id.* at 84.

Notwithstanding "conflicting language" elsewhere in the *Hardison* decision, that phrasing—"more than a *de minimis* cost"—emerged as the operative definition of undue hardship among "many lower courts." *See Groff*, 600 U.S. at 454, 465. As the Supreme Court recently explained, "it is doubtful" that the *Hardison* Court intended that line to be amplified as "the authoritative interpretation of the statutory term 'undue hardship.'" *Id.* at 464. After all, a formulation that requires "more" than a *de minimis* burden does not explain *how much* "more" is sufficient to qualify as "undue" hardship and overcome a plaintiff's prima facie showing of discrimination. *See id.* at 474 (Sotomayor, J., concurring) (describing the phrase "more than a *de minimis* cost" as "loose language"). Thus, in *Groff*, the Supreme Court weighed in to "clarify what Title VII requires" with respect to undue hardship. 600 U.S. at 454.

The plaintiff in *Groff* was an Evangelical Christian who worked as a carrier for the United States Postal Service. *Id.* He was unwilling to work on Sundays due to his sincerely held belief that, on that day of the week, only worship and rest is permissible. *Id.* He was progressively disciplined at work before he resigned and sued for discrimination under Title VII. *Id.* at 456. The Supreme Court in *Groff* explained that reading undue hardship according to "its meaning in ordinary use" comports both with EEOC cases decided before amendments to Title VII in 1972, and with *Hardison*. *Id.* at 469-70. The *Groff* Court also observed that the facts and

14

analysis in *Hardison* were incompatible with the subsequent suggestion that any "*de minimis cost*" would constitute an "undue hardship," noting that the *Hardison* opinion itself "stat[ed] three times that an accommodation is not required when it entails 'substantial' 'costs' or 'expenditures.'" *Id.* at 464 (citing *Hardison*, 432 U.S. at 83 n.14). Thus, the Court held, a bare "'*de minimis* cost' . . . does not suffice to establish 'undue hardship' under Title VII." *Id.* at 468. *See also id.* at 474 (Sotomayor, J., concurring) (explaining that *Hardison* "must be understood in light of its facts and the Court's reasoning," including its conclusion that the accommodation requested in *Hardison* "would have required the employer either to deprive other employees of their seniority rights under a collective-bargaining agreement, or to incur substantial additional costs in the form of lost efficiency or higher wages"). Rather, "undue hardship" requires a showing that the asserted burden "is substantial in the overall context of an employer's business." *Id.* at 468.

Whether a religious accommodation imposes an undue hardship depends on "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer." *Id.* at 470-71 (cleaned up). Those costs need not be economic. *EEOC v. Greyhound Lines, Inc.*, 554 F. Supp. 3d 739, 752 (D. Md. 2021) (citing *Webb v. City of Philadelphia*, 562 F.3d 256, 260 (3d Cir. 2009)). "For instance, courts have found that non-economic costs such as damage to employee morale, compromise of a collective bargaining agreement or seniority system, or unequal treatment of other employees, can constitute undue hardships." *Id.* (citations omitted). This includes accommodations unreasonably imperiling employee safety. *See, e.g.*, *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship."); *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d

745, 758 (E.D.N.Y. 1998) ("Where . . . the proposed accommodation threatens to compromise safety in the workplace, the employer's burden of establishing an undue burden is light indeed."), *aff'd*, 189 F.3d 461 (2d Cir. 1999); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 521 (6th Cir. 1976) ("safety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on an employer's business").

Both pre- and post-*Groff*, courts can and must consider not just financial factors as part of the undue hardship analysis, but rather a holistic "assessment of a possible accommodation's effect on the conduct of the employer's business, not the bottom line alone." *Chavez v. San Francisco Bay Area Rapid Transit Dist.*, -- F. Supp. 3d --, No. C 22-06119 WHA, 2024 WL 3334741, at *11 (N.D. Cal. Mar. 18, 2024) (cleaned up, citing *Groff*, 600 U.S. at 471, and 42 U.S.C. § 2000e(j)). In other words, "[t]he Supreme Court in *Groff* did not limit undue hardship to a dollars-and-cents showing." *Id.* "Increased health and safety risks—including risks to the continued operation of the business due to employee illness and death—may likewise impact the conduct of a business." *Id.* (citing various post-*Groff* cases: *Bordeaux v. Lions Gate Ent., Inc.*, 703 F. Supp. 3d 1117, 1134-37 (C.D. Cal. 2023); *Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929 (CS), 2023 WL 3467143, at *6 (S.D.N.Y. May 15, 2023); *Kushner v. N.Y.C. Dep't of Educ.*, No. 22-CV-5265-DLI-VMS, 2023 WL 6214236, at *5 (E.D.N.Y. Sept. 25, 2023)).

### 2.    Sheppard Pratt's EEOC interpretation reliance defense

The contested employment actions in this case happened before *Groff* was decided. As noted above, if Sheppard Pratt can show that it made its decision to deny Ms. Hall's vaccination exemption request "in good faith, in conformity with, and in reliance on any written interpretation or opinion of the [EEOC]," it would be entitled to summary judgment. 42 U.S.C. §

2000e-12(b). Sheppard Pratt asserts that two EEOC sources support the contested decisions: the EEOC website offering technical assistance with respect to federal statutes as they apply to COVID-19, and the EEOC regulation entitled *Guidelines on Discrimination Because of Religion*, 29 C.F.R. § 1605 (the "*Guidelines* regulation"). *See* ECF No. 32-5 ¶¶ 8, 11-13. Although neither EEOC source expressly authorized employers to mandate vaccination, Sheppard Pratt maintains that they both set forth controlling interpretations of the relevant legal standard for determining whether an action amounts to unlawful discrimination. Sheppard Pratt further contends that, insofar as *Groff* changed the undue hardship standard for religious discrimination under Title VII, Sheppard Pratt was entitled to rely on these sources' articulation of "more than *de minimis* cost" as the operative standard.

An employer is entitled to rely on the good-faith-reliance defense if it made the employment decision at issue "in good faith, in conformity with, and in reliance on any written interpretation or opinion of the [EEOC]." 42 U.S.C. § 2000e-12(b). The EEOC has interpreted "written interpretation or opinion" as limited to

> (a) A letter entitled "opinion letter" and signed by the Legal Counsel on behalf of and as approved by the Commission, or, if issued in the conduct of litigation, by the General Counsel on behalf of and as approved by the Commission, or
>
> (b) Matter published and specifically designated as such in the Federal Register, including the Commission's Guidelines on Affirmative Action, or
>
> (c) A Commission determination of no reasonable cause, issued, under the circumstances described in § 1608.10 (a) or (b) of the Commission's Guidelines on Affirmative Action, 29 CFR part 1608, when such determination contains a statement that it is a "written interpretation or opinion of the Commission.

29 C.F.R. § 1601.93.

Neither of the sources Sheppard Pratt relies on are EEOC "opinions" or "determination[s] of no reasonable cause." The question under 29 C.F.R. § 1601.93, therefore, is whether they constitute "written interpretation[s]" of the EEOC within the meaning of 42 U.S.C. § 2000e-12(b). Sheppard Pratt's first source, the "*What You Should Know*" page on EEOC's Technical Assistance website, describes "undue hardship" as "more than minimal cost or burden" and an "easier standard for employers to meet than the ADA's undue hardship standard." ECF No. 32-5 ¶ 13. The website goes on to state, "Considerations relevant to undue hardship can include, among other things, the proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, whose vaccination status could be unknown or who may be ineligible for the vaccine." *Id.*

Sheppard Pratt's second relied-upon source, the *Guidelines* regulation, contains the EEOC's interpretation of *Hardison* as requiring "due regard given to the identifiable cost in relation to the size and operating cost of the employer, and the number of individuals who will in fact need a particular accommodation." 29 C.F.R. § 1605.2(e)(1). It provides that, on one hand, costs such as "the regular payment of premium wages of substitutes" would "constitute undue hardship." *Id.* On the other hand, costs such as "infrequent payment of premium wages for a substitute or the payment of premium wages while a more permanent accommodation is being sought" or "the payment of administrative costs necessary for providing the accommodation" such as "rearranging schedules and recording substitutions" would *not* constitute "more than a *de minimis* cost." *Id.* Sheppard Pratt relies on the *Guidelines* regulation to contend that (1) "[a]t the time of the challenged decision, the EEOC's written interpretation used the more than *de minimis* test"; (2) Sheppard Pratt "relied on that interpretation in making its decision"; and (3) the

18

undisputed evidence establishes that the burden on Sheppard Pratt was "more than *de minimis*." Def.'s Mem. at 23.

The *Guidelines* regulation clearly constitutes a "written interpretation[]" of the EEOC because it was "published and specifically designated as such in the Federal Register." 29 C.F.R. § 1601.93(a)-(c); *see* 45 Fed. Reg. 72610 (Oct. 31, 1980). Whether the "*What You Should Know*" website qualifies is far less clear.[2] But the Court need not decide that issue, or whether Sheppard Pratt is entitled to good-faith-reliance immunity under either EEOC source, because whether measured against the *Hardison* or *Groff* articulation of "undue hardship," the undisputed evidence establishes that granting Ms. Hall's accommodation request would have constituted an undue hardship. And although it was reasonable for Sheppard Pratt to rely on the EEOC's articulation of the pre-*Groff* standard, the Supreme Court has expressly directed that *Groff* is intended to clarify—not change—the legal standard for undue hardship under Title VII. *See, e.g.*, *Groff*, 600 U.S. at 473 ("Having clarified the Title VII undue-hardship standard, we think it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance."). Moreover, there is little if any daylight between the EEOC's pre-*Groff* guidance cited by Sheppard Pratt and *Groff* itself, as explained above.

---

[2] Sheppard Pratt concedes that the "*What You Should Know*" website does not qualify as "written interpretation" under the EEOC's interpretation of that term, because it was not "published and specifically designated as such in the Federal Register." 29 C.F.R. § 1601.93(a)-(c). Sheppard Pratt argues, however, that the EEOC's interpretation of the statutory phrase "written interpretation or opinion" is "*ultra vires*" because the EEOC "lacks authority to issue 'substantive rules that create rights and obligations'"—and thus the website should be considered a "written interpretation or opinion of the [EEOC]" within the meaning of the statute, 42 U.S.C. § 2000e-12(b), even though it does not satisfy the EEOC's standard. Def.'s Mem. at 23 (quoting *EEOC v. Raymond Metal Products Co*., 530 F.2d 590, 593 (4th Cir. 1976)).

### 3.    Undue Hardship

That leaves the question of whether a reasonable jury could find that Sheppard Pratt, with the information available to it at the time, could have "reasonably accommodate[d]" Ms. Hall's request to be exempted from COVID-19 vaccination "without undue hardship on the conduct of the employer's business." *See* 42 U.S.C. § 2000e(j).

As explained above, as a patient-facing staff member, Ms. Hall regularly interacted with both vulnerable patients and the medical personnel treating them. ECF No. 32-4 at 76:5-77:8, 79:1-8, 80:19-21, 89:18-90:3, 91:1-9. She also shared a small office with another employee. *Id*. at 77:14-78:16. The patients at the Center for Eating Disorders suffered from illnesses that increased their susceptibility to infection. *Id.* at 71:3-4. They also were prone to harsher, more protracted recoveries with a higher mortality rate than that of healthy individuals. ECF No. 32-2 ¶¶ 41-46. Many patients were diagnosed with co-occurring medical issues, compounding the measures needed to protect and treat them. *See e.g.*, *id.* ¶¶ 43-46. Infection among patients or staff risked not only staffing, new-patient admission, and resource allocation issues but disruptions in treatment and an inferior quality of care. *Id.* ¶¶ 24, 25, 27, 54, 55, 56. Moreover, the appearance that Sheppard Pratt was not prioritizing the safety of its patients and staff could have eroded public trust, an essential for any healthcare facility. *See id.* ¶¶ 8, 11, 21, 27, 55, 56, 74, 75. Accommodating her also directly and personally imposed on Ms. Hall's fellow employees. "Because the 'conduct of [a] business' plainly includes the management and performance of the business's employees, undue hardship on the conduct of a business may include undue hardship on the business's employees." *Groff*, 600 U.S. at 474 (Sotomayor, J., concurring); *see also, e.g.*, *Firestone Fibers & Textiles Co*., 515 F.3d at 318 ("[I]t was

permissible for Firestone to consider the rights and perceptions of fairness of other employees when determining whether to provide such an accommodation.").

There is no evidence in the record from which a reasonable jury could find facts to the contrary; the most Plaintiff cites is her own testimony that the statistics Sheppard Pratt relies upon were not "specific to me or my job at Sheppard Pratt," and that other unspecified "nurses" at Sheppard Pratt, in some unspecified unit(s) elsewhere in the health system, were permitted to "work[] with patients in the patient's rooms" without being vaccinated. ECF No. 37-1 ¶¶ 27, 30; *see also* Pl.'s Opp. at 12-18. But even viewed in the light most favorable to Ms. Hall, the undisputed evidence in the record establishes that permitting Ms. Hall to continue with her intensive, in-person contact with the Center for Eating Disorders' vulnerable patient population while in an unvaccinated state would have entailed not only substantial financial costs, but also substantial patient, employee, and public safety risks as well as reputational harm for the health system. These circumstances amount to more than a *de minimis* cost to Sheppard Pratt. They constitute an undue hardship as prescribed in the EEOC regulations, 29 C.F.R. § 1605, and the then-common understanding of an employer's obligation to accommodate. And they easily satisfy the standard as articulated in *Groff*. These collective circumstances justified Sheppard Pratt's conclusion that exempting Ms. Hall from the vaccination requirement presented "substantial increased costs" within the meaning of *Groff*.

Ms. Hall objects to Sheppard Pratt's apparent diverging approaches to determining religious and medical exemptions. But the Americans with Disabilities Act has its own definition of undue hardship, requiring an employer to show that accommodation "would impose" a hardship entailing "significant difficulty or expense." 42 U.S.C. § 12112(b)(5) (ADA undue hardship provision); *id.* § 12111(10) (defining undue hardship for ADA purposes). The Supreme

Court expressly rejected the invitation in *Groff* to incorporate the ADA standard into Title VII. 600 U.S. at 471; *see also id.* at 474 (Sotomayor, J., concurring) ("Petitioner Gerald Groff asks this Court to overrule *Hardison* and to replace it with a "significant difficulty or expense" standard. . . . The Court does not do so."). Whether Sheppard Pratt was justified in concluding, with respect to other employees, that accommodating particular *medical* exemption requests would have presented "significant difficulty or expense" is a separate question, governed by a different standard—one that is not before the Court in this case.

Even if the religious and medical exemption standards were identical, however, Sheppard Pratt considered each request independent of the others and in the context of each applicant's specific situation. Sheppard Pratt's decision to grant certain medical exemptions does not necessarily reflect, as Ms. Hall contends, its belief that her circumstances were not "legitimate." *See* Pl.'s Opp. at 21. Such an inference, without more, is tantamount to "unsupported speculation," which cannot defeat summary judgment. *Felty*, 818 F.2d at 1128. Further, the record reflects that there were more than double the submissions for religious exemption than medical exemption. Although these requests were evaluated on a case-by-case basis, it was within Sheppard Pratt's discretion and responsibility to consider the aggregate impact of granting multiple employees the same accommodation. *See e.g.*, *Groff*, 600 U.S. at 468 (requiring employers to consider hardship in "the overall context of an employer's business"); *see also id.* at 476 (Sotomayor, J., concurring) ("[F]or many businesses, labor is more important to the conduct of the business than any other factor."); *Hardison*, 432 U.S. at 83 n.15 (holding that employers may properly consider the aggregate effect of granting an accommodation where other employees may be similarly situated).

There is also evidence that Sheppard Pratt considered alternatives, including masking and weekly testing as proposed by Ms. Hall. ECF No. 32-2 ¶ 66, 67, 68, 69, 70. But the undisputed evidence establishes that such arrangements were not safe or feasible, or otherwise would have been less effective than vaccination. *Id*. The requirements of the Admissions Coordinator position could not be modified, as in-person contact was an essential function of the job. *See, e.g.*, ECF No. 32-3 at 43:13-46:17. Ms. Hall declined transferring to another position at Sheppard Pratt. *See, e.g.*, ECF No. 32-4 at 148:17-149:15. Her masking proposal was not a true alternative, as both vaccinated and unvaccinated employees were already required to wear masks under the policy. ECF No. 32-2 ¶ 64. And Sheppard Pratt concluded that it lacked the capacity and resources to implement weekly testing. *Id*. ¶ 70. In any event, Sheppard Pratt deemed weekly testing too infrequent and too unreliable to trust as a viable substitute to vaccination. *Id*. ¶¶ 67-69. Ms. Hall could have become infected without detection or between tests, and exposed others to infection in that time. *Id*. ¶¶ 68, 69. The tests also occasionally produced inaccurate results. *Id*. ¶ 67. And then-prevailing medical data indicated that vaccinated persons were much less likely to transmit COVID-19 than unvaccinated individuals, and transmission between unvaccinated individuals was the primary cause of the ongoing spread of the disease. *Id*. ¶¶ 60-63.

For these reasons, the undisputed facts show that Sheppard Pratt's determination that it could not reasonably accommodate Ms. Hall was the result of careful deliberation, and its reasons for refusing to implement her proposed alternatives, given their economic implications and inefficacy, were substantiated. Her disagreement alone does not render those conclusions unreasonable. *See Firestone Fibers & Textiles Co*., 515 F.3d at 317 ("[A]n employer is not required 'to wait until it [feels] the effects' of the proposed accommodation before determining its reasonableness . . . employers must be given leeway to plan their business operations and

possible accommodative options in advance, relying on an accommodation's predictable consequences along the way."). Thus, as a matter of law there was sufficient basis for Sheppard Pratt to deny Ms. Hall's request for religious exemption, and terminate her employment for refusing to become vaccinated. On these grounds, summary judgment of her claim against Sheppard Pratt for failure to accommodate is appropriate.

**B.    Disparate Treatment**

To the extent Ms. Hall intended to assert a disparate treatment claim, Sheppard Pratt is entitled to summary judgment on that claim as well. Ms. Hall has not adduced evidence that Sheppard Pratt treated her differently than similarly situated employees outside her protected class. There is also no evidence from which a jury could reasonably conclude that Sheppard Pratt asserted undue hardship as a pretext to terminate Ms. Hall for her religious beliefs.

To demonstrate religious discrimination under a theory of disparate treatment, Ms. Hall "must demonstrate that the employer treated her differently than other employees because of her religious beliefs." *Chalmers*, 101 F.3d at 1017. In the absence of "direct evidence," Ms. Hall may make a prima facie case of unlawful disparate treatment by showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Polk v. Amtrak Nat'l R.R. Passenger Corp.*, 66 F.4th 500, 507 (4th Cir. 2023) (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)). If she establishes a prima facie case of religious discrimination, then Sheppard Pratt must proffer a non-discriminatory explanation for the adverse employment action. *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973). If Sheppard Pratt does so, the burden shifts back to Ms. Hall, who then must prove that the

proffered justification is pretextual, and that the challenged actions were taken because of her religion. *Id.* at 804-805.

Whether Ms. Hall is claiming disparate treatment is unclear. *See* Pl.'s Opp. at 19 ("Ms. Hall can establish a claim for religious discrimination under the disparate treatment theory[,] even though Ms. Hall's case is a failure to accommodate case."). In any event, Sheppard Pratt has never challenged the sincerity of Ms. Hall's religious convictions and, given her tenure and promotions at Sheppard Pratt, there is no disagreement (at least on the present record) as to whether she carried out her job competently. *See, e.g.*, ECF No. 32-3 at 49:8-13. Nor is there any serious dispute that her termination constituted an adverse employment action. Her claim cannot survive summary judgment, however, for two reasons.

First, insofar as Ms. Hall asserts a disparate treatment claim, it is premised on a comparator theory, not "direct evidence" of religious discrimination. *See Polk*, 66 F.4th at 507. But "to establish a valid comparator," a plaintiff must produce evidence of particular comparators who were similarly situated, such as other employees who "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (citation omitted). Ms. Hall has not done so. Although she contends there were individuals who sought exemption from vaccination on medical grounds who "would be accommodated and the employee would be subject to weekly testing as well as the requirement to wear a mask," Pl.'s Opp. at 21, she provides no evidence that any colleagues who were granted medical exemptions were in fact similarly situated. *See Hurst v. D.C.*, 681 F. App'x 186, 191 (4th Cir. 2017) ("The similarity between comparators and the seriousness of their respective

25

offenses must be clearly established in order to be meaningful.") (quoting *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008)). For example, Ms. Hall has not identified evidence in the record that the job requirements of the comparators she proffers had anything like the intensive in-patient interaction that Ms. Hall's job required, let alone with patients of heightened vulnerability like the Center's patients. She also has not offered evidence for why potential comparators' requests were granted, or what accommodations Sheppard Pratt provided them. *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) ("[T]he mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion.") (quoting *Anderson*, 477 U.S. at 252). But also, as noted above, the standard for disability accommodation is different than that for religious accommodation. *See, e.g.*, *Groff*, 600 U.S. at 471. In short, there is no evidence from which a reasonable jury could find that Ms. Hall was subjected to "different treatment from similarly situated employees outside the protected class." *Polk*, 66 F.4th at 507.

Second, even there were cognizable comparator evidence, Sheppard Pratt would be entitled to summary judgment because, for the same reasons as those discussed above, the undisputed evidence establishes as a matter of law that Sheppard Pratt had non-discriminatory reasons for requiring Ms. Hall to be vaccinated, including the welfare of its patients and staff. *See e.g.*, *Smith v. St. Joseph's Med. Ctr.*, No. 22-CV-5231, 2024 WL 2058619, *4 (S.D.N.Y. May 7, 2024) (affirming employee's termination for religion-based refusal to comply with employer's COVID-19 vaccination mandate). And there is no evidentiary basis on which a jury could find that requiring that Ms. Hall be vaccinated was a pretext for discriminating against her because of her religion. Among other things, she was invited to apply for other opportunities within the

health system, and was informed that she remained eligible for rehire should she become vaccinated or Sheppard Pratt's vaccination policy change. *See, e.g.*, ECF No. 32-3 at 45:7-8.

For these reasons, insofar as Ms. Hall asserts a disparate treatment claim, Sheppard Pratt is entitled to summary judgment on that claim as well.

### CONCLUSION

For the foregoing reasons, the Court grants Defendant's motions for summary judgment (ECF No. 32). A separate order follows.


Date:   September 20, 2024                          _____*/s/*_____

                                                    Adam B. Abelson
                                                    United States District Judge

27